**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>      *Plaintiff*,<br>  v.<br><br>NOVELIS, INC.<br>   and<br>ALERIS CORPORATION,<br><br>      *Defendants*. | Civil Action No.: |

## COMPLAINT

The United States of America brings this civil antitrust action pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18, to enjoin Novelis Inc.'s ("Novelis") proposed acquisition of its new and disruptive rival, Aleris Corporation ("Aleris").  The United States alleges as follows:

### I.   INTRODUCTION

1.      Automakers are turning to aluminum to make vehicles lighter, so they can satisfy consumer demand for larger vehicles while enhancing fuel efficiency, safety, and performance.  As a result, demand for rolled aluminum sheet for automotive applications (commonly referred to as "automotive body sheet" or "ABS") is growing.

1

2.	Novelis and Aleris are two of only four aluminum ABS suppliers in North America.  If permitted to proceed, the transaction would concentrate approximately 60 percent of total production capacity and the majority of uncommitted (open) capacity with Novelis.  Novelis has long been one of only a few aluminum ABS suppliers in North America, while Aleris is a relatively new competitor that—in Novelis's own words—is "poised for transformational growth."  By acquiring Aleris, Novelis would lock up a large share of available aluminum ABS capacity for the foreseeable future, which would immediately and negatively impact competition in this market.  Novelis's own deal documents reveal an anticompetitive motivation behind this acquisition: preventing rivals from acquiring a disruptive competitor, Aleris, so that Novelis can maintain its current high prices.

3.	The transaction likely would lessen competition substantially in the market for aluminum ABS sold to North American customers in violation of Section 7 of the Clayton Act and, unless enjoined, automakers and American consumers will be harmed through higher prices, reduced innovation, and less favorable terms of service.

## II.	INDUSTRY OVERVIEW

A. Background on Aluminum ABS

4.	The North American automotive industry is a vital sector of the American economy.  The industry represents the single largest manufacturing sector in the United States, accounting for about three percent of gross domestic product.  In 2017, over 11 million vehicles were produced in the United States.  For decades, automakers used flat-rolled steel almost exclusively in the construction of automotive bodies.

5.      Growing consumer demand for larger vehicles loaded with safety and performance features has led automakers to pursue light-weight designs.  Automakers have turned to aluminum ABS, which is 30 to 40 percent lighter than traditional steel, as the material of choice for light-weighting the next generation of vehicles.

6.      Although aluminum is substantially more expensive than steel, aluminum has distinct and superior physical properties.  Vehicles made with aluminum are lighter and more fuel-efficient.  Aluminum ABS is also safer and more durable, absorbing substantially more energy than traditional steel upon impact.  Light-weight vehicles also have significant performance advantages including faster acceleration, better handling, shorter braking distance, and increased payload and towing capabilities.  In addition to aluminum ABS's significant light-weighting advantages, aluminum ABS is also highly formable, resists breaking, and provides more styling options for automobile designers than traditional steel.

7.      Automakers recognize that aluminum ABS offers light-weighting, physical, and performance benefits over traditional steel such that the two materials are not close substitutes for many important design and engineering features, even though traditional steel still comprises the majority of the material used in cars.  Some automakers, such as the Ford Motor Company, have adopted an aluminum-intensive design for certain vehicle models (*e.g.*, the F-150 pickup truck), achieving significant weight-savings and performance benefits.  Other automakers are pursuing light-weight designs using an incremental "multi-material" approach, in which automakers use the best material for each particular part or application.  Under the multi-material approach,

3

aluminum ABS is being used to replace traditional steel in large automotive panels, such as the hood, liftgates, doors and fenders (*i.e.*, the vehicle's "skin"). By doing so, automakers can substantially reduce the weight of vehicles, meet regulatory emissions targets, and achieve safety and performance benefits that could not be done using steel.

8.     Light-weighting designs are also critical for the next generation of electric vehicles. Aluminum ABS can reduce electric vehicle weight by up to 20 percent, allowing an electric vehicle to run farther on a single charge.

9.     Aluminum ABS is recognized as a critical input in automakers' light-weighting strategies. As automakers continue to build the bigger-yet-more-efficient vehicles that consumers demand, more and more aluminum ABS will be incorporated into automobile models.

10.     Aluminum ABS demand is increasing. An industry-wide study conducted by Ducker Worldwide predicts that the total aluminum content in vehicles will increase 37 percent from about 400 pounds per vehicle in 2015 to more than 550 pounds by 2028.

11.     Supply is tight. Suppliers have limited capacity to produce aluminum ABS. In North America, much of the aluminum ABS production capacity is already committed to fulfilling automaker orders. A supplier must have sufficient uncommitted capacity to satisfy the automaker's aluminum ABS quantity requirements in order to bid or compete for new vehicle models. A supplier that cannot meet those requirements because it has little or no uncommitted capacity cannot effectively compete for the business.

4

12.     Based on Ducker's projections and their own market intelligence, Novelis and Aleris each independently has determined that the demand for aluminum ABS in North America will soon outgrow market supply.  The majority of aluminum ABS production capacity is already committed to fulfilling existing automakers' orders, leaving the bulk of uncommitted capacity with Novelis and its target, Aleris.

13.     Additional capacity cannot be readily brought online to meet growing demand.  Barriers to entry are high and expansion of existing production facilities is costly and takes years to complete.  Moreover, steel suppliers cannot readily shift to production of aluminum ABS because aluminum ABS is produced using a distinct process on specialized equipment.

14.     Due to transportation costs and supply chain risks, importing aluminum ABS is not a primary sourcing strategy for most automakers in North America.  Imports, therefore, make up only a marginal volume of supply.

B.  Novelis is Seeking to Eliminate an Emerging Competitive Threat through this Acquisition

15.     For years, North American aluminum ABS production was dominated by just two firms, Novelis and another large domestic rival.  By its own account, Novelis enjoyed this "favorable industry structure" because it allowed Novelis to embark on a "price leadership strategy" and realize "substantial market based pricing movement." Novelis took advantage of this industry structure to increase prices to certain automaker customers by up to 30 percent.

16.     In 2016, Aleris, an aluminum ABS producer in the European market, established facilities in the United States.  Aleris's entry had an immediate impact on

5

pricing in North America, forcing Novelis to lower its prices.  For instance, internal documents confirm that "Novelis reduced [its] base price by up to 5%" for one automaker in order to compete with Aleris's lower prices.   Fearing lower prices from Aleris for another automaker customer, Novelis dropped its bid by about five percent to "be in the range of Aleris."  New capacity from Aleris threatened Novelis's "premium pricing," and in turn, Novelis's high profit margins.

17.    Aleris's entry into North America not only undercut Novelis's prices and margins, but it also resulted in vigorous head-to-head competition with Novelis on customer service and support.  Based on its experience in Europe, Aleris immediately established a technical support center in the Detroit area to work closely with automaker design engineers to expand the use of aluminum ABS solutions.  Novelis's CEO, Steve Fisher, testified that Aleris "actually was in front of [Novelis] a little bit… with the customer solution center."   In response, Novelis copied Aleris's efforts, starting its own solution center less than 30 miles from Aleris's facility.

18.    Even before Aleris began producing aluminum ABS coils in the United States, Novelis tried to buy Aleris as a way to preserve the "favorable industry structure" that enabled Novelis's "premium pricing."  Aleris's private equity owners had, however, already agreed to sell Aleris to a foreign buyer.  When Aleris's deal with the foreign buyer unraveled in the fall of 2017, Novelis aggressively moved to acquire Aleris.

19.    Novelis was particularly concerned that in the hands of another buyer, Aleris would further erode Novelis's prices and margins.  In documents setting forth Novelis's strategic analysis of the transaction, the Novelis due diligence team expressed

concern that if Novelis were not the acquirer, Aleris could be sold to a "[n]ew market entrant in the US with lower pricing discipline" than Novelis, and that an "[a]lternative buyer [was] likely to bid aggressively and negatively impact pricing" in the market.  A "key takeaway" of this analysis was that, by acquiring Aleris itself, Novelis "[p]revents competitors from acquiring assets and driving less disciplined pricing."

20.     This same anticompetitive rationale was repeated in numerous internal analyses of the deal that were generated by, or presented to, top Novelis executives and/or the Novelis Board of Directors.  These analyses of the deal state:

- "[A]n acquisition by us as the market leader will help preserve the industry structure versus a new player . . . coming into our growth markets and disturbing the industry structure to create space for himself, while hurting us the most."

- Novelis should buy Aleris because an "alternative buyer [is] likely to bid aggressively and negatively impact pricing."

- Another buyer of Aleris likely would be a "[n]ew market entrant in the US with lower pricing discipline" that would create the "potential for accelerated price declines as they seek to fill capacity."  If not Novelis, an alternative buyer might have "lower pricing discipline."

Novelis conducted a "build or buy" analysis of Aleris that concluded as "key takeaways" that Novelis should acquire Aleris because there is a "disincentive for market leader [*i.e.*, Novelis] to add capacity and contribute to a price drop" and an acquisition of Aleris "prevents competitors from acquiring assets and driving less disciplined pricing."

### III.     DEFENDANTS AND THE PROPOSED TRANSACTION

21.     Novelis is a global manufacturer of semi-finished aluminum products with global revenues of approximately $12.3 billion for the fiscal year ending March 31, 2019.  The company is incorporated in Canada and headquartered in Atlanta, Georgia.  It

7

operates 23 production facilities in North America, South America, Europe and Asia. Eight facilities are located in North America, including two (Oswego, New York, and Kingston, Ontario) that currently produce aluminum ABS. Another aluminum ABS finishing line is under construction in Guthrie, Kentucky. Novelis supplies flat-rolled aluminum products in three segments: beverage can, specialty and automotive.

22.     Novelis is a wholly-owned subsidiary of Hindalco Industries, Ltd., an Indian company headquartered in Mumbai, India.

23.     Aleris also is a global manufacturer of semi-finished aluminum products, generating global revenues of approximately $3.4 billion in 2018. Aleris is a Delaware corporation, headquartered in Cleveland, Ohio and operates 13 production facilities in North America, South America, Europe, and Asia. Aleris supplies flat-rolled aluminum products to the automotive, aerospace and building and construction industries, among others. Aleris has been a producer of aluminum ABS in Europe since 2002, and recently expanded ABS production into the North America market with new ABS production lines in Lewisport, Kentucky.

24.     Novelis and Aleris entered into a definitive Agreement and Plan of Merger, dated July 26, 2018. Under this agreement, Novelis will acquire 100 percent of the voting securities of Aleris for an estimated enterprise value of $2.6 billion.

## IV.     THE RELEVANT MARKET THREATENED BY THE ACQUISITION

25.     Aluminum ABS sold to automakers in North America constitutes a relevant antitrust market and line of commerce under Section 7 of the Clayton Act. A well-accepted methodology for determining a relevant market for antitrust analysis is to

ask whether a hypothetical monopolist over all products in the proposed market could profitably impose at least a small but significant and non-transitory increase in price, or SSNIP.  *See Fed. Trade Comm'n & U.S. Dep't of Justice Horizontal Merger Guidelines* (2010) ("Horizontal Merger Guidelines"); *accord Fed. Trade Comm'n v. Whole Foods Mkt.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008).  A hypothetical monopolist of aluminum ABS sold to automakers in North America could profitably increase prices by at least a SSNIP because North American automakers are unlikely to substitute away from aluminum ABS in sufficient quantities to make that price increase unprofitable. Therefore, the sale of aluminum ABS to North American automakers is a relevant antitrust market.

### A.  Relevant Product Market

26.     An automaker can make a car part out of aluminum, steel, or other material, but there are substantial differences in the physical properties of aluminum (as compared to steel), such that an automotive engineer designing a car with particular weight, performance, safety specifications, and target retail price is unlikely to view steel and other materials as full functional substitutes for aluminum for the various car parts being designed.  Nor is any other material likely to significantly impact the pricing of aluminum ABS for most car parts, or vice-versa.  Aluminum ABS is a distinct line of commerce and constitutes a relevant product market even if a broader market for automotive materials may also exist.

27.     Aluminum ABS is different from other materials used in automotive applications and meets many of the practical indicia that courts rely on to define a

9

relevant product market.  As an initial matter, Novelis and Aleris and other industry participants recognize aluminum ABS as a distinct product with its own market dynamics.  Novelis and Aleris describe themselves as "leaders" in the aluminum ABS market, and they calculate market share for the automotive business by looking to sales of aluminum ABS alone.  In strategic planning documents commenting on the competitive landscape in aluminum ABS, Novelis boasted that it is the "[m]arket leader with ~60% share" of the "[a]utomotive business in North America."  Similarly, in the defendants' ordinary course of business documents, the defendants refer predominantly to the supply, demand, and competitiveness of other aluminum ABS suppliers when discussing competitive dynamics in the automotive industry.

28.     Aluminum ABS also has physical properties that are distinctive from other automotive materials.  Compared to steel, for instance, aluminum has a higher strength-to-weight ratio, higher strength in large panels, and superior corrosion resistance.  These qualities are highly sought after by auto designers and engineers.  Alternative materials, such as steel, generally do not share these attributes and therefore, these materials are not reasonable substitutes for aluminum ABS for automakers when designing and engineering the technical and performance specifications of vehicles.

29.     Steel companies are developing lighter, high strength steel varieties for the auto industry.  But as Novelis has observed, high strength steel "is largely replacing existing mild steel" and "cannibalizing the existing material" (*i.e.*, traditional steel).  The threat of substitution from aluminum to high strength steel is, as Aleris confirms, "limited."

30.     The price of aluminum ABS is also distinct from other ABS materials, including steel.  Aluminum ABS is about three to four times more expensive than traditional steel per pound, but North American automakers continue to adopt aluminum ABS in place of steel because of its superior light-weighting qualities and performance and safety benefits.  As a result of those qualities, even as aluminum commodity pricing rose in 2018, Novelis prepared to tell its investors that "[w]e are not seeing demand destruction in our markets."  Moreover, while aluminum ABS prices are sensitive to price changes of aluminum ABS from other aluminum ABS suppliers, they are not sensitive to price changes in other materials, such as steel.

31.     Further, from the automaker's perspective, the use of aluminum ABS requires a different tooling and joining process than the default production process of steel automotive parts.  Automakers continue to invest millions of dollars to upgrade their production plants as they move towards greater adoption of aluminum.

**B.  Relevant Geographic Market**

32.     The relevant geographic market in which to assess the competitive harm from the proposed transaction is North America.  When a supplier can price differently based on customer location, the Horizonal Merger Guidelines provide that the relevant geographic market may be defined based on the locations of targeted customers.  Such pricing is possible in aluminum ABS as evidenced by the different prices charged by suppliers across geographic regions.  For example, Novelis has observed that "North America enjoys the highest regional pricing" with Novelis's pricing several hundred dollars per ton higher in North America than in Europe.  Because of transportation costs,

11

import tariffs and duties, the limited shelf life of most types of aluminum ABS, and supply chain risks, customers of aluminum ABS in North America are unlikely to be able to defeat a price increase through arbitrage from outside North America.

33.     This price gap between North America and other geographic regions has persisted over many years, supporting the conclusion that North America is a relevant geographic market.

## V.     ANTICOMPETITIVE EFFECTS OF THE ACQUISITION

34.     The proposed acquisition is likely to lead to anticompetitive effects.  As an initial matter, this transaction is presumptively anticompetitive.  The Supreme Court has held that mergers that significantly increase concentration in concentrated markets are presumptively anticompetitive and, therefore, unlawful.  *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363-65 (1963).  To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI") as described in the Horizontal Merger Guidelines.  Mergers that increase the HHI by more than 200 and result in an HHI above 2,500 in any market are presumed to be anticompetitive.

35.     The North American aluminum ABS market is already highly concentrated.  By Novelis's own assessment, post-merger, Novelis could control more than 60 percent of the North American aluminum ABS market.  Based on current sales estimates—which includes a marginal volume of imports—if Novelis were allowed to acquire Aleris, the HHI would increase by almost 500 points to a post-transaction HHI reaching almost 4,000.  Thus, this merger is presumed to be anticompetitive under Supreme Court precedent.

12

36. Beyond the presumption provided under Supreme Court precedent, the facts establish the probable anticompetitive effect of the merger. First, Aleris's expansion into the North American market had an immediate positive impact on competition and pricing. Novelis reduced its pricing to some of the industry's largest and most significant automakers in order to meet customer "targets (as set by Aleris)," or to "be in the range of Aleris." With uncommitted production capacity and its recent $425 million aluminum ABS expansion at its facility in Lewisport, Kentucky, Aleris is poised to continue to compete vigorously with Novelis by offering lower prices in an effort to steal share.

37. Through this acquisition, however, Novelis would seize control of Aleris's uncommitted capacity, eliminating a rival it described as "poised for transformational growth." Aleris and Novelis are the only two firms expected to have sizable uncommitted North American capacity over the next few years. If the merger is enjoined, head-to-head competition between Aleris and Novelis would likely intensify as they fight to fill their production lines. As Novelis's own documents reveal, this competition would have disrupted Novelis's "premium pricing" strategy, resulting in lower prices to automakers.

38. In addition, the proposed acquisition likely would reduce quality and innovation in aluminum ABS. For example, Novelis copied Aleris's establishment of a technical support center in the Detroit area, which was developed to work directly with automakers. The merger would eliminate this type of competition between the two firms.

39. If allowed to proceed, the proposed acquisition would reduce the number

13

of North American aluminum ABS suppliers from 4 to 3.  This consolidation would concentrate more than half of the domestic aluminum ABS sales, 60 percent of projected total domestic capacity, and the majority of uncommitted domestic capacity under the control of one firm.

40.     Post-transaction, no other firms would have the incentive and ability to constrain Novelis.  The transaction would result in higher prices, as well as reduced innovation and technical support for automakers that rely on this critical input.

## VI.     ABSENCE OF COUNTERVAILING FACTORS

41.     New entry or expansion by existing competitors is unlikely to prevent or remedy the transaction's likely anticompetitive effects in the market for aluminum ABS.

42.     The aluminum ABS market has significant barriers to entry.  Barriers include the high cost and long-time frame needed to build production facilities.  For example, to compete in the automotive market, aluminum companies generally must build a specialized "heat-treat" finishing line to make aluminum sheet for automotive applications.  These heat-treat finishing lines take years to build and cost hundreds of millions of dollars to construct, and require sophisticated technological know-how to operate.

43.     In addition to heat-treat finishing lines, aluminum ABS suppliers need aluminum coils that are wide enough for automotive applications.  These aluminum coils are produced at hot mills, and there are only a few hot mills in North America.  Building a new hot mill takes several years and requires a significant capital investment of well over a billion dollars.  Meanwhile, expanding or re-outfitting an existing facility to have

14

auto-capable hot mill capacity could also require several hundred million dollars.

44.    As a result of these barriers, entry into the market for aluminum ABS would not be timely, likely, or sufficient to defeat the substantial lessening of competition that is likely to result from Novelis's acquisition of Aleris.

45.    Moreover, because of supply chain risks and other factors, customers of the merged firm (*i.e.*, North American automakers) are unlikely to turn to foreign suppliers of aluminum ABS in sufficient volume to mitigate the anticompetitive effects of the merger.

## VII.    JURISDICTION AND VENUE

46.    The United States brings this civil antitrust action against defendants Novelis and Aleris under Section 15 of the Clayton Act, 15 U.S.C. § 25, as amended, to prevent and restrain defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

47.    This Court has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a) and 1345. Novelis and Aleris develop, manufacture, and sell aluminum ABS in the flow of interstate commerce.  The activities of Novelis and Aleris in developing, manufacturing, and selling these products substantially affect interstate commerce.

48.    This Court has personal jurisdiction over Novelis and Aleris.  Both parties have significant contacts with this judicial district:  Novelis is registered to do business in the State of Ohio and transacts business in this District; Aleris is headquartered in Cleveland, Ohio and also transacts business in this District.  Moreover, Novelis's

proposed acquisition of Aleris will have effects throughout the United States, including in this District.

49. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §1391(b) and (c).

## VIII. VIOLATION ALLEGED

50. Novelis's acquisition of Aleris is likely to lessen substantially competition in the relevant market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

51. The transaction will have the following effects, among others:

    a. Eliminate head-to-head competition between Novelis and Aleris in the development, manufacture and sale of aluminum ABS;

    b. Likely reduce competition between and among Novelis and the remaining suppliers of aluminum ABS; and

    c. Likely cause prices of the relevant product to increase, delivery times to lengthen, terms of service to become less favorable, and innovation to be reduced.

## IX. REQUEST FOR RELIEF

52. The United States requests that this Court:

    a. adjudge and decree the acquisition of Aleris by defendant Novelis to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

    b. preliminarily and permanently enjoin and restrain the defendants from carrying out the proposed acquisition of Aleris by Novelis or any other transaction that would combine the two companies and further enjoin

16

the defendants from taking any steps towards completing the

acquisition of Aleris by Novelis;

c.  award such temporary and preliminary injunctive and ancillary relief

as may be necessary to avert the dissipation of Aleris's tangible and

intangible assets during the pendency of this action and to preserve the

possibility of effective permanent relief;

d.  award the United States the cost of this action; and

e.  grant the United States such other and further relief as the Court deems

just and proper.

Respectfully submitted,

**September 4, 2019**

FOR PLAINTIFF UNITED STATES OF AMERICA,

MAKAN DELRAHIM
Assistant Attorney General

KATHLEEN S. O'NEILL
Senior Director of Investigations and
Litigation

CRAIG W. CONRATH
Director of Litigation

PATRICIA A. BRINK
Director of Civil Enforcemen

JULIA A. SCHILLER
Counsel to the Assistant Attorney
General

JOHN READ
Acting Chief, Defense, Industrials, and
Aerospace Section

STEPHANIE A. FLEMING
Assistant Chief, Defense, Industrials, and
Aerospace Section

SAMER M. MUSALLAM (OH #0078472)
LOWELL R. STERN
BLAKE W. RUSHFORTH
BASHIRI WILSON
ANGELA TING
JAMES FOSTER
SIDDARTH DADHICH
THOMAS DEMATTEO
ETHAN STEVENSON
Trial Attorneys
Antitrust Division
United States Department of Justice
450 Fifth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 598-2990
Facsimile: (202) 514-9033
*samer.musallam@usdoj.gov*

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)**  County of Residence of First Listed Plaintiff _____<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1   U.S. Government
       Plaintiff

❏ 2   U.S. Government
       Defendant

❏ 3   Federal Question
       *(U.S. Government Not a Party)*

❏ 4   Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                              *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place<br>of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a<br>Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance<br>❏ 120 Marine<br>❏ 130 Miller Act<br>❏ 140 Negotiable Instrument<br>❏ 150 Recovery of Overpayment<br>  & Enforcement of Judgment<br>❏ 151 Medicare Act<br>❏ 152 Recovery of Defaulted<br>  Student Loans<br>  (Excludes Veterans)<br>❏ 153 Recovery of Overpayment<br>  of Veteran's Benefits<br>❏ 160 Stockholders' Suits<br>❏ 190 Other Contract<br>❏ 195 Contract Product Liability<br>❏ 196 Franchise | **PERSONAL INJURY**<br>❏ 310 Airplane<br>❏ 315 Airplane Product<br>  Liability<br>❏ 320 Assault, Libel &<br>  Slander<br>❏ 330 Federal Employers'<br>  Liability<br>❏ 340 Marine<br>❏ 345 Marine Product<br>  Liability<br>❏ 350 Motor Vehicle<br>❏ 355 Motor Vehicle<br>  Product Liability<br>❏ 360 Other Personal<br>  Injury<br>❏ 362 Personal Injury -<br>  Medical Malpractice | **PERSONAL INJURY**<br>❏ 365 Personal Injury -<br>  Product Liability<br>❏ 367 Health Care/<br>  Pharmaceutical<br>  Personal Injury<br>  Product Liability<br>❏ 368 Asbestos Personal<br>  Injury Product<br>  Liability<br>**PERSONAL PROPERTY**<br>❏ 370 Other Fraud<br>❏ 371 Truth in Lending<br>❏ 380 Other Personal<br>  Property Damage<br>❏ 385 Property Damage<br>  Product Liability | ❏ 625 Drug Related Seizure<br>  of Property 21 USC 881<br>❏ 690 Other<br><br><br>**LABOR**<br>❏ 710 Fair Labor Standards<br>  Act<br>❏ 720 Labor/Management<br>  Relations<br>❏ 740 Railway Labor Act<br>❏ 751 Family and Medical<br>  Leave Act<br>❏ 790 Other Labor Litigation<br>❏ 791 Employee Retirement<br>  Income Security Act | ❏ 422 Appeal 28 USC 158<br>❏ 423 Withdrawal<br>  28 USC 157<br><br>**PROPERTY RIGHTS**<br>❏ 820 Copyrights<br>❏ 830 Patent<br>❏ 835 Patent - Abbreviated<br>  New Drug Application<br>❏ 840 Trademark<br>**SOCIAL SECURITY**<br>❏ 861 HIA (1395ff)<br>❏ 862 Black Lung (923)<br>❏ 863 DIWC/DIWW (405(g))<br>❏ 864 SSID Title XVI<br>❏ 865 RSI (405(g)) | ❏ 375 False Claims Act<br>❏ 376 Qui Tam (31 USC<br>  3729(a))<br>❏ 400 State Reapportionment<br>❏ 410 Antitrust<br>❏ 430 Banks and Banking<br>❏ 450 Commerce<br>❏ 460 Deportation<br>❏ 470 Racketeer Influenced and<br>  Corrupt Organizations<br>❏ 480 Consumer Credit<br>❏ 485 Telephone Consumer<br>  Protection Act<br>❏ 490 Cable/Sat TV<br>❏ 850 Securities/Commodities/<br>  Exchange<br>❏ 890 Other Statutory Actions<br>❏ 891 Agricultural Acts |
| **REAL PROPERTY**<br>❏ 210 Land Condemnation<br>❏ 220 Foreclosure<br>❏ 230 Rent Lease & Ejectment<br>❏ 240 Torts to Land<br>❏ 245 Tort Product Liability<br>❏ 290 All Other Real Property | **CIVIL RIGHTS**<br>❏ 440 Other Civil Rights<br>❏ 441 Voting<br>❏ 442 Employment<br>❏ 443 Housing/<br>  Accommodations<br>❏ 445 Amer. w/Disabilities -<br>  Employment<br>❏ 446 Amer. w/Disabilities -<br>  Other<br>❏ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>❏ 463 Alien Detainee<br>❏ 510 Motions to Vacate<br>  Sentence<br>❏ 530 General<br>❏ 535 Death Penalty<br>**Other:**<br>❏ 540 Mandamus & Other<br>❏ 550 Civil Rights<br>❏ 555 Prison Condition<br>❏ 560 Civil Detainee -<br>  Conditions of<br>  Confinement | **IMMIGRATION**<br>❏ 462 Naturalization Application<br>❏ 465 Other Immigration<br>  Actions | **FEDERAL TAX SUITS**<br>❏ 870 Taxes (U.S. Plaintiff<br>  or Defendant)<br>❏ 871 IRS—Third Party<br>  26 USC 7609 | ❏ 893 Environmental Matters<br>❏ 895 Freedom of Information<br>  Act<br>❏ 896 Arbitration<br>❏ 899 Administrative Procedure<br>  Act/Review or Appeal of<br>  Agency Decision<br>❏ 950 Constitutionality of<br>  State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

❏ 1  Original
      Proceeding

❏ 2  Removed from
      State Court

❏ 3  Remanded from
      Appellate Court

❏ 4  Reinstated or
      Reopened

❏ 5  Transferred from
      Another District
      *(specify)*

❏ 6  Multidistrict
      Litigation -
      Transfer

❏ 8  Multidistrict
      Litigation -
      Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
_____

Brief description of cause:
_____

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:    ❏ Yes   ❏ No

## VIII. RELATED OR REFILED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO

**I.**     Civil Categories: (Please check <u>one category only</u>).

    1. ☐     General Civil
    2. ☐     Administrative Review/Social Security
    3. ☐     Habeas Corpus Death Penalty

    \*If under Title 28, §2255, name the SENTENCING JUDGE: _____

                                     CASE NUMBER: _____

**II.**     <u>**RELATED OR REFILED CASES**</u>.  See LR 3.1 which provides in pertinent part: "If an action is filed or removed to this Court and assigned to a District Judge after which it is discontinued, dismissed or remanded to a State court, and subsequently refiled, it shall be assigned to the same Judge who received the initial case assignment without regard for the place of holding court in which the case was refiled.  Counsel or a party without counsel shall be responsible for bringing such cases to the attention of the Court by responding to the questions included on the Civil Cover Sheet."

    This action:    is **RELATED** to another  **PENDING** civil case    is a **REFILED** case    was **PREVIOUSLY REMANDED**

**If applicable, please indicate on page 1 in section VIII, the name of the Judge and case number.**

**III.**     In accordance with Local Civil Rule **3.8**, actions involving counties in the Eastern Division shall be filed at any of  the divisional offices therein.  Actions involving counties in the Western Division shall be filed at the Toledo office. For the purpose of determining the proper division, and for statistical reasons, the following information is requested.

    ANSWER ONE PARAGRAPH ONLY. ANSWER PARAGRAPHS 1 THRU 3 IN ORDER.  UPON FINDING WHICH PARAGRAPH APPLIES TO YOUR CASE, ANSWER IT AND STOP.

    (1)    <u>**Resident defendant**</u>. If the defendant resides in a county within this district, please set forth the name of such county
    <u>**COUNTY:**</u>
    <u>Corporation</u> **For the purpose of answering the above, a corporation is deemed to be a resident of that county in which it has its principal place of business in that district.**

    (2)    <u>**Non-Resident defendant**</u>. If no defendant is a resident of a county in this district, please set forth the county wherein the cause of action arose or the event complained of occurred.
    <u>**COUNTY:**</u>

    (3)    <u>**Other Cases**</u>. If no defendant is a resident of this district, or if the defendant is a corporation not having a principle place of business within the district, and the cause of action arose or the event complained of occurred outside this district, please set forth the county of the plaintiff's residence.
    <u>**COUNTY:**</u>

**IV.**     The Counties in the Northern District of Ohio are divided into divisions as shown below.  After the county is determined in Section **III**, please check the appropriate division.

<u>**EASTERN DIVISION**</u>

    ☐  **AKRON**           **(Counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas and Wayne)**
    ☐  **CLEVELAND**     **(Counties: Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake,**
                                        **Lorain, Medina and Richland)**
    ☐  **YOUNGSTOWN**    **(Counties: Columbiana, Mahoning and Trumbull)**

<u>**WESTERN DIVISION**</u>

    ☐  **TOLEDO**          **(Counties: Allen, Auglaize, Defiance, Erie, Fulton, Hancock, Hardin, Henry,**
                                   **Huron, Lucas, Marion, Mercer, Ottawa, Paulding, Putnam, Sandusky, Seneca**
                                   **VanWert, Williams, Wood and Wyandot)**

# <u>ATTACHMENT TO CIVIL COVER SHEET</u>

**<u>Attorneys for Plaintiff United States of America:</u>**

Samer M. Musallam (202-598-2990)
Lowell R. Stern (202-514-3676)
Blake W. Rushforth (202-532-4484)
Bashiri Wilson (202-598-8794)

Antitrust Division
United States Department of Justice
450 Fifth Street, N.W., Suite 8700
Washington, D.C. 20530