## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>NOVELIS INC.<br><br>and<br><br>ALERIS CORPORATION,<br><br>*Defendants*. | Case No.: 1:19-cv-02033-CAB |

## COMPETITIVE IMPACT STATEMENT

The United States of America, under Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "APPA" or "Tunney Act"), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### I.     NATURE AND PURPOSE OF THE PROCEEDING

On July 26, 2018, Defendant Novelis Inc. ("Novelis") agreed to acquire Defendant Aleris Corporation ("Aleris") for approximately $2.6 billion, which would have made the combined company the largest supplier of aluminum automotive body sheet ("ABS") in the United States. The United States filed a civil antitrust Complaint on September 4, 2019, seeking to enjoin the proposed acquisition. The Complaint alleges that the likely effect of this acquisition would be to substantially lessen competition for the development, manufacture, and sale of aluminum ABS in North America, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Before the United States initiated this lawsuit, the United States and Defendants agreed that the lawfulness of the transaction under Section 7 of the Clayton Act (15 U.S.C. § 18) hinged on whether aluminum ABS constitutes a relevant product market under the antitrust laws. As set forth in more detail in Plaintiff United States' Explanation of Plan to Refer this Matter to Arbitration (Dkt. 11), the United States, using its authority under the Administrative Dispute Resolution Act of 1996 ("ADRA"), 5 U.S.C. § 571 *et seq.*, reached an agreement with Defendants to refer this matter to binding arbitration following fact discovery should the parties be unable to reach a resolution that resolved the United States' competitive concerns with the Defendants' transaction within a certain period of time. Per the arbitration agreement, binding arbitration would resolve a single dispositive issue: whether aluminum ABS constitutes a relevant product market under the antitrust laws. Further, the United States and Defendants agreed that if the United States prevailed in arbitration, the United States would then file a proposed Final Judgment requiring Defendants to divest Aleris's Lewisport Rolling Mill in Lewisport, Kentucky and related assets, which constitute Aleris's entire aluminum ABS operations in North America. The arbitration agreement recognized that the Court would retain jurisdiction to determine whether entry of the proposed Final Judgment is in the public interest. *See* 15 U.S.C. § 16(b)-(h). Had Defendants prevailed in arbitration, the arbitration agreement would have required the United States to seek to voluntarily dismiss the Complaint.

To preserve the Divestiture Assets pending the outcome of the arbitration, the Court entered a Hold Separate Stipulation and Order on January 9, 2020, requiring Novelis to hold separate, preserve, and maintain the Divestiture Assets as set forth in the proposed Final Judgment. (Dkt. 41). Under the terms of that Order, Novelis took certain steps to ensure that the

Divestiture Assets were preserved and operated in such a way as to ensure that the Divestiture Assets continue to be ongoing, economically viable business units.

On January 21, 2020, following the completion of fact discovery, the Court entered an Order staying proceedings and referring the matter to binding arbitration pursuant to the ADRA, 5 U.S.C. § 571, *et seq.* (Dkt. 44). On March 9, 2020, the United States prevailed in arbitration with the arbitrator determining that aluminum ABS is a relevant product market under the antitrust laws. *See* Arbitration Decision, March 9, 2020 (public version) (attached hereto as Exhibit 1).

The United States has therefore filed a proposed Modified Hold Separate Stipulation and Order ("Modified Stipulation and Order") and a proposed Final Judgment, which are designed to address the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, Defendants are required to divest the Divestiture Assets, which include the Lewisport Rolling Mill in Lewisport, Kentucky and Aleris's Innovation Center in Madison Heights, Michigan.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.     DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.     The Defendants and the Proposed Transaction

Novelis is a global manufacturer of semi-finished aluminum products with global revenues of approximately $12.3 billion for the fiscal year ending March 31, 2019. The company is incorporated in Canada and headquartered in Atlanta, Georgia. It operates 23

production facilities in North America, South America, Europe, and Asia. Eight facilities are located in North America, including two (Oswego, New York, and Kingston, Ontario) that currently produce aluminum ABS. Another aluminum ABS finishing line is being commissioned in Guthrie, Kentucky. Novelis supplies flat-rolled aluminum products in three segments: beverage can, specialty, and automotive. Novelis is a wholly-owned subsidiary of Hindalco Industries, Ltd., an Indian company headquartered in Mumbai, India.

Aleris also is a global manufacturer of semi-finished aluminum products. It generated global revenues of approximately $3.4 billion in 2018. Aleris is a Delaware corporation, headquartered in Cleveland, Ohio, and operates 13 production facilities in North America, South America, Europe, and Asia. Aleris supplies flat-rolled aluminum products to the automotive, aerospace, and building and construction industries, among others. Aleris has been a producer of aluminum ABS in Europe since 2002 and exported small volumes of aluminum ABS to North America from its European facility. In 2017, following significant financial and capital investments in its Lewisport, Kentucky facility, Aleris began developing, manufacturing, and selling aluminum ABS from its Lewisport facility to meet growing North American customer demand. Lewisport is a fully integrated manufacturing facility that includes a cast house, as well as cold and hot mill operations. In addition to its hot mill used to manufacture heat-treated aluminum ABS, the Lewisport facility's cold mill continues to produce non-heat-treated aluminum alloys for "specialty" products used in the construction industry. The entire Lewisport facility will be divested.

Novelis and Aleris entered into a definitive Agreement and Plan of Merger, dated July 26, 2018, for Novelis to acquire 100 percent of the voting securities of Aleris for an estimated enterprise value of $2.6 billion. As permitted under the terms of the Arbitration Agreement (Dkt.

11-1 at ¶ 5) and the Hold Separate Stipulation and Order entered by the Court on January 9, 2020 (Dkt. 41), Defendants consummated their transaction on April 14, 2020.

### B.     Industry Background

The North American automotive industry is a vital sector of the American economy. The industry represents the single largest manufacturing sector in the United States, accounting for about three percent of gross domestic product. For decades, automakers used flat-rolled steel almost exclusively in the construction of automotive bodies. Growing consumer demand for larger vehicles loaded with safety and performance features and increasing fuel economy regulations have led automakers to pursue light-weight designs.

Automakers have turned to aluminum ABS, which is 30 to 40 percent lighter than traditional steel, as the material of choice for light-weighting the next generation of vehicles. Aluminum is more expensive than steel, but has distinct and superior physical properties for automotive use. Vehicles made with aluminum are lighter and more fuel-efficient. Light-weight vehicles also have significant performance advantages including faster acceleration, better handling, shorter braking distance, and increased payload and towing capabilities. Light-weighting designs are also critical for the next generation of electric vehicles. Aluminum ABS can reduce electric vehicle weight substantially, allowing an electric vehicle to run farther on a single charge.

### C.     Relevant Product Market

As alleged in the Complaint, aluminum ABS is different from other materials used in automotive body sheet applications. Steel and other materials are not practical substitutes for aluminum ABS in many applications. The Complaint alleges that in the event of a small but significant non-transitory price increase, automakers would not substitute away from aluminum

ABS in a sufficient volume to make the price increase unprofitable.   Therefore, the Complaint alleges that the development, manufacture, and sale of aluminum ABS is a relevant product market and line of commerce within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Following the completion of fact discovery, the Court referred the matter to arbitration to adjudicate the issue of relevant product market. On March 9, 2020, the arbitrator issued a decision in which he determined that aluminum ABS is a relevant product market under the antitrust laws. *See* Arbitration Decision, March 9, 2020 (public version) (Exhibit 1).  As the arbitrator explained, an automaker can make a car part out of aluminum, steel, or other material, but there are substantial differences in the physical properties of aluminum (as compared to steel), such that an automotive engineer designing a car with particular weight, performance, safety specifications, and target retail price is unlikely to view steel and other materials as full functional substitutes for aluminum for the various car parts being designed.  Nor is any other material likely to significantly impact the pricing of aluminum ABS for most car parts, or vice-versa. The development, manufacture, and sale of aluminum ABS is a distinct line of commerce and constitutes a relevant product market.

**D.   Geographic Market**

The Complaint alleges that the relevant geographic market in which to assess the competitive harm from the proposed transaction is North America.  When a supplier can price differently based on customer location, the Horizontal Merger Guidelines provide that the relevant geographic market may be defined based on the locations of targeted customers.  Such pricing is possible in aluminum ABS as evidenced by the different prices charged by suppliers across geographic regions.  Because of transportation costs, import tariffs and duties, the limited

shelf life of most types of aluminum ABS, and supply chain risks, customers of aluminum ABS in North America are unlikely to be able to defeat a price increase through arbitrage from outside North America. Pricing differences among suppliers in the various geographic regions in which aluminum ABS is sold has persisted over many years, supporting the conclusion that North America is a relevant geographic market.

The Complaint alleges that, in the event of a small but significant non-transitory increase in the price of the aluminum ABS, customers in North America would not procure these products from suppliers located outside North America in a sufficient volume to make such a price increase unprofitable. Accordingly, the Complaint alleges that North America is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

### E. Anticompetitive Effects

The Complaint alleges that Novelis, Aleris, and two other firms are the only producers of aluminum ABS located in North America. Through this acquisition, however, Novelis would gain control of Aleris's uncommitted capacity, eliminating a rival Novelis described as "poised for transformational growth." Aleris and Novelis are the only two firms expected to have sizable uncommitted North American capacity to produce aluminum ABS over the next few years. This consolidation would concentrate more than half of the domestic aluminum ABS production and sales, 60 percent of projected total domestic capacity, and the majority of uncommitted domestic capacity under the control of one firm.

The Complaint alleges that, post-transaction, no other firms would have the incentive and ability to constrain Novelis. The transaction would result in higher prices, as well as reduced innovation and technical support for automakers that rely on this critical input. According to the Complaint, the proposed acquisition, therefore, would likely substantially lessen competition in

the development, manufacture, and sale of aluminum ABS in North America in violation of Section 7 of the Clayton Act.

### F.  Absence of Countervailing Factors: Entry

The Complaint alleges that entry or expansion by existing competitors is unlikely to prevent or remedy the transaction's likely anticompetitive effects in the market for the development, manufacture, and sale of aluminum ABS in North America. The North American aluminum ABS market has significant barriers to entry. Barriers include the high cost and long time-frame needed to build production facilities. For example, to compete in the automotive market, aluminum companies generally must build a specialized "heat-treat" finishing line to make aluminum sheet for automotive applications. These heat-treat finishing lines take years to build and cost hundreds of millions of dollars to construct, and require sophisticated technological know-how to operate. In addition to heat-treat finishing lines, aluminum ABS suppliers need aluminum coils that are wide enough for automotive applications. These aluminum coils are produced at hot mills, and there are only a few hot mills in North America. Building a new hot mill takes several years and requires a significant capital investment of well over a billion dollars. Meanwhile, expanding or re-outfitting an existing facility to have auto-capable hot mill capacity could also require several hundred million dollars. Moreover, because of supply chain risks and other factors, the Complaint alleges that customers of the merged firm (*i.e.*, North American automakers) are unlikely to turn to foreign suppliers of aluminum ABS in sufficient volume to mitigate the anticompetitive effects of the merger.

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The divestiture required by the proposed Final Judgment addresses the United States' concerns with the merger and will fully remedy the loss of competition threatened by this merger by requiring the merged firm to divest Aleris's North American aluminum ABS operations in their entirety.  In doing so, the divestiture will establish an independent and economically viable competitor with the scale and scope to compete effectively and preserve competition in the market for the development, manufacture, and sale of aluminum ABS in North America.

Paragraph IV(A) of the proposed Final Judgment requires Defendants to divest the Divestiture Assets within the later of ninety (90) calendar days of the filing of the Modified Stipulation and Order, or thirty (30) days after the Regulatory Approvals have been received, to an acquirer acceptable to the United States, in its sole discretion.  Paragraph IV(A) provides that the United States, in its sole discretion, may grant one or more extensions of the divestiture period, up to a total of 180 days.  The proposed Final Judgment includes the possibility of an additional 180 days to accomplish the divestiture due to the current business climate and the potential impact of the COVID-19 pandemic on Defendants' ability to accomplish the divestiture within the specified period.

The divestiture includes two facilities (one production facility in Lewisport, Kentucky ("the Lewisport Rolling Mill") and one technical service center located in Madison Heights, Michigan ("the Innovation Center")); and all other tangible and intangible assets related to or used in connection with the Lewisport Rolling Mill.  Paragraph IV(J) of the proposed Final Judgment requires that the Divestiture Assets must be divested in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be operated by the purchaser as part of a viable, ongoing business that can compete effectively in the development, manufacture, and sale of aluminum ABS.

The proposed Final Judgment contains provisions to facilitate the immediate use of the Divestiture Assets by the acquirer. Paragraph IV(H) of the proposed Final Judgment requires Defendants, at the acquirer's option, to enter into a transition services agreement on or before the date on which the Divestiture Assets are divested to the acquirer for service and support relating to the Divestiture Assets for a period of up to twelve (12) months. That paragraph further provides that the United States, in its sole discretion, may approve one or more extensions of this transition services agreement for up to a total of an additional six (6) months. Paragraph IV(H) also provides that employees of Defendants tasked with providing any transition services must not share any competitively sensitive information of the acquirer with any other employee of Defendants.

The proposed Final Judgment also contains provisions intended to facilitate the acquirer's efforts to hire employees engaged in the Divestiture Assets. Paragraph IV(C) of the proposed Final Judgment requires Defendants to provide the acquirer with organization charts and information relating to these employees and to make them available for interviews, and it provides that Defendants must not interfere with any negotiations by the acquirer to hire them. In addition, Paragraph IV(C)(5) provides that, for employees who elect employment with the acquirer, Defendants must waive all non-compete and non-disclosure agreements, vest all unvested pension and other equity rights, and provide all benefits that the employees would generally be provided if transferred to a buyer of an ongoing business. This paragraph further provides that, for a period of twelve (12) months from the filing of the Complaint, Defendants may not solicit to hire or hire any employee engaged in the Divestiture Assets who was hired by the acquirer, unless that individual is terminated or laid off by the acquirer or the acquirer agrees in writing that Defendants may solicit or hire that individual.

If Defendants do not accomplish the divestiture within the period prescribed in the proposed Final Judgment, Section V of the proposed Final Judgment provides that the Court will appoint a divestiture trustee selected by the United States to effect the divestiture.  If a divestiture trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The divestiture trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished.  After the divestiture trustee's appointment becomes effective, the trustee will provide periodic reports to the United States setting forth his or her efforts to accomplish the divestiture.  At the end of six (6) months, if the divestiture has not been accomplished, the divestiture trustee and the United States will make recommendations to the Court, which will enter such orders as appropriate, in order to carry out the purpose of the trust, including by extending the trust or the term of the divestiture trustee's appointment.

The proposed Final Judgment also contains provisions designed to promote compliance and make the enforcement of the Final Judgment as effective as possible.  Paragraph XIV(A) provides that the United States retains and reserves all rights to enforce the provisions of the Final Judgment, including its rights to seek an order of contempt from the Court.  Under the terms of this paragraph, Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Defendants have waived any argument that a different standard of proof should apply.  This provision aligns the standard for compliance obligations with the standard of proof that applies to the underlying offense that the compliance commitments address.

Paragraph XIV(B) provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. The proposed Final Judgment is intended to restore competition the United States alleged would otherwise be harmed by the transaction. Defendants agree that they will abide by the proposed Final Judgment, and that they may be held in contempt of this Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph XIV(C) of the proposed Final Judgment provides that if the Court finds in an enforcement proceeding that Defendants have violated the Final Judgment, the United States may apply to the Court for a one-time extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XIV(C) provides that in any successful effort by the United States to enforce the Final Judgment against a Defendant, whether litigated or resolved before litigation, that Defendant will reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with any enforcement effort, including the investigation of the potential violation.

Paragraph XIV(D) states that the United States may file an action against a Defendant for violating the Final Judgment for up to four (4) years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision, therefore, makes clear that, for four

(4) years after the Final Judgment has expired or been terminated,  the United States may still challenge a violation  that occurred during  the term of the Final Judgment.

Finally,  Section XV of the proposed Final Judgment provides that the Final Judgment will expire ten (10) years from the date of its entry, except that after five (5) years from the date of its entry, the Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestiture  has been completed and that the continuation  of the Final Judgment is no longer necessary or in the public  interest.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited  by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees.  Entry of the proposed Final Judgment neither impairs  nor assists the bringing  of any private antitrust damage action.  Under the provisions  of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated  that the proposed Final Judgment  may be entered by the Court after compliance  with the provisions  of the APPA, provided that the United States has not withdrawn its consent.  The APPA conditions  entry upon the Court's determination  that the proposed Final Judgment is in the public  interest.

The APPA provides a period  of at least 60 days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment.  Any person who wishes to comment should

do so within 60 days of the date of publication of this Competitive Impact Statement in the *Federal Register*, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the response of the United States will be filed with the Court. In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the *Federal Register*.

Written comments should be submitted to:

> Katrina Rouse
> Chief, Defense, Industrials, and Aerospace Section
> Antitrust Division
> U.S. Department of Justice
> 450 Fifth Street, NW, Suite 8700
> Washington, D.C. 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the binding arbitration on the issue of relevant product market definition and the proposed Final Judgment, the United States considered a full trial on the merits against Defendants. The United States could have sought preliminary and permanent injunctions against Novelis's acquisition of Aleris. The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will remedy the anticompetitive effects alleged in the Complaint, preserving competition for the development, manufacture, and sale of aluminum ABS in North America. Thus, the proposed Final Judgment achieves all or

substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

> (A)   the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)   the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see also United States, et al. v. Hillsdale Community Health Ctr.*, No. 15-12311 (JEL), 2015 WL 10013774 at *1 (E.D. Mich. Oct. 21, 2015) ("[T]he Court's review is limited to deciding whether the proposed final judgment is in the "public interest;" the Court is without authority to modify it.") (citations omitted); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist.

LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to

16

congressional intent. *Id.* at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152-53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms.") (internal citations omitted); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*,

2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."); *United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using consent judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

18

## VIII.   DETERMINATIVE DOCUMENTS

In formulating the proposed Final Judgment, the United States considered the Arbitration Agreement (Exhibit A to Plaintiff United States' Explanation of Plan to Refer this Matter to Arbitration (Dkt. 11-1)), and the Arbitration Decision (attached hereto as Exhibit 1). Under the Tunney Act, the United States must provide copies of documents it considered determinative in formulating its remedy proposal. (*See 15* U.S.C. §16(b)). The Arbitration Agreement is a determinative document because it (a) establishes that the parties agree to file a proposed Final Judgment requiring Defendants to divest Aleris's Lewisport Rolling Mill in Lewisport, Kentucky should the United States prevail in arbitration and (b) establishes that the arbitration addresses one dispositive legal issue: whether aluminum ABS is a relevant product market. The Arbitration Decision is a determinative document because it provides the reasoning for the arbitrator's decision, after hearing evidence, that aluminum ABS is a relevant product market. There are no other determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: **May 12, 2020**

Respectfully submitted,

**FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

 /s/ Samer M. Musallam
Samer M. Musallam (Ohio #0070472)
Lowell R. Stern
United States Department of Justice
Antitrust Division, DIA Section
450 Fifth Street, N.W., Suite 8700
Washington, D.C. 20530
Tel.: (202) 598-2990
Email: samer.musallam@usdoj.gov
Email: lowell.stern@usdoj.gov

*Attorneys for Plaintiff United States*